## TAINES *v.* MUNSON

1. MORTGAGES—EQUITABLE MORTGAGE—DEED—EQUITY.

   A deed absolute on its face may be declared to be a mortgage by a court of equity.

2. MORTGAGES—EQUITABLE MORTGAGE—EQUITY—EVIDENCE.

   Pecuniary embarrassment of the grantor in a deed to property, his indebtedness to the grantee, and inadequacy of consideration for the deed are looked to by a court of equity in determining whether a document that purports to be a deed absolute is actually an equitable mortgage.

3. MORTGAGES—EQUITABLE MORTGAGE—DEED—EVIDENCE—FINANCIAL CIRCUMSTANCES—CONSIDERATION.

   Determination that a document given by plaintiffs to defendant which purported to be a deed was actually an equitable mortgage *held* proper where defendant did the plumbing work for plaintiffs' building construction business, where plaintiffs were heavily indebted to defendant for work performed, where defendant's refusal to do further work until he was paid halted construction on the many unfinished homes which represented plaintiffs' only assets, and where the money given by defendant for the transfer of the land represented less than half the value of the land transferred.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 36 Am Jur, Mortgages § 125.
[2] 36 Am Jur, Mortgages §§ 150, 153.
[3] 36 Am Jur, Mortgages § 147 *et seq.*
[4] 36 Am Jur, Mortgages § 151.
[5] 27 Am Jur 2d, Equity § 152.
[6] 36 Am Jur, Mortgages §§ 130, 193 *et seq.*
[7, 8] 36 Am Jur, Mortgages § 190.
[9] 27 Am Jur 2d, Equity § 136.
[10] 19 Am Jur 2d, Corporations § 1591.
[11, 12] 45 Am Jur 2d, Interest and Usury § 262 *et seq.*
[13] 45 Am Jur 2d, Interest and Usury § 96.
Date of verdict or date of entry of judgment thereon as beginning of interest period on judgment. 1 ALR2d 479.
[14] 45 Am Jur 2d, Interest and Usury § 60.

4. Mortgages—Equitable Mortgage—Evidence.

Defendant's contention that an instrument conveying land from plaintiff to him should be regarded as a deed and not as a mortgage because there was no obligation for plaintiff to repay the money tendered by defendant and because plaintiff had a unilateral option to repurchase the property is without merit where the record shows that defendant repeatedly requested that plaintiff repay the money given him by defendant for the conveyance of the property, thus revealing an intention between the parties that the money represented a loan.

5. Equity—Defenses—Laches—Elements.

Laches is an affirmative defense, and mere lapse of time, without a showing of prejudice, will not constitute laches.

6. Mortgages — Equitable Mortgage — Equity of Redemption — Waiver — Laches — Abandonment.

A person does not lose his equity of redemption in an equitable mortgage under the theories of laches, waiver, or abandonment by mere inaction or nonpayment.

7. Mortgages—Equitable Mortgage—Estoppel.

Plaintiff cannot be estopped from asserting his equity of redemption in an equitable mortgage which he gave to defendant where defendant cannot show prejudice.

8. Property—Mortgage—Equitable Mortgage—Equity of Redemption—Estoppel.

Payments on a land contract covering certain real property and payment of taxes on the property by the person to whom plaintiff gave a deed of his vendee's interest in the property as an equitable mortgage on the property is not evidence that prejudice would result from permitting plaintiff to assert his equity of redemption where the mortgagee did not act differently than he would if he were simply protecting his security interest and he could be made whole in an accounting; therefore this evidence is not sufficient to estop plaintiff from asserting his equity of redemption.

9. Mortgages—Equitable Mortgage—Sham Sale—Equity.

The principle that a court should leave the parties where it finds them where a transaction between the parties was a fraud on plaintiff's other creditors has no application in an action for an accounting or an equitable mortgage where plaintiff executed a deed of real property to defendant and recorded the

transaction on his books as a sale and where defendant, as a pressing creditor, was the one who insisted on the sham sale.

10. CORPORATIONS—DEFUNCT CORPORATION—CORPORATE ACTIVITY.

Statement by one of the directors of a defunct corporation that he hoped to reactivate the corporation does not amount to "activity" by the corporation which would prevent the corporation from being properly in court as a defunct corporation in the process of winding up (MCLA § 450.75).

11. CORPORATIONS—LOANS—INTEREST—USURY STATUTE.

A corporate agreement to pay more than the legal interest rate on a loan meets the requirement of the usury statute only if the agreement is in writing (MCLA § 450.78).

12. CORPORATIONS—LOANS—INTEREST—CORPORATE OFFICER—ADMISSION.

An admission in court by a corporate officer that he had orally agreed that his corporation would pay more than the legal interest rate on a loan is not a writing within the meaning of the statute requiring such an agreement to be in writing to be enforceable (MCLA § 450.78).

13. JUDGMENT—INTEREST—STATUTE—EFFECTIVE DATE.

Statute providing that interest from the date the complaint was filed to the date judgment is entered is to be paid on all money judgments operates retrospectively and applies to all actions accrued, pending, or future (MCLA § 600.6013).

14. JUDGMENT—INTEREST—EQUITY.

A court of equity, in an accounting, may in its discretion based on the equities presented, allow or withhold interest as under the circumstances of the case seems equitable and just, except in cases where interest is recoverable as a matter of right.

Appeal from Wayne, James Montante, J. Submitted Division 1 April 10, 1969, at Detroit. (Docket No. 5,107.) Decided August 27, 1969. Application for leave to appeal filed September 16, 1969.

Complaint by Gerald Taines, Michael Z. Taines, and Alger Homes, Inc., a Michigan corporation, against Jack Munson, and Evelyn Munson, his wife,

for an accounting on an equitable mortgage. Judgment for defendants. Plaintiffs appeal. Reversed and remanded for an accounting.

*Kratchman & Kratchman,* for plaintiffs.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*Donald E. Shely* and *J. Kay Felt,* of counsel), for defendants.

Before: Lesinski, C. J., and Fitzgerald and V. J. Brennan, JJ.

Lesinski, C. J. Plaintiffs sued defendants for an accounting on a claimed equitable mortgage. The trial court found that the 1959 "sale" of an interest in land was in fact an equitable mortgage, but that plaintiffs had lost their right to claim an interest in the land because of laches, waiver and abandonment. Plaintiffs appeal.

Alger Homes, Inc., was in 1959 a building and development corporation wholly owned by Michael Taines (although Michael's brother, Gerald Taines, had only recently sold his one-half interest in the company to Michael, and continued to take an active part in the affairs of Michael and of Alger Homes). On January 2, 1958, Michael Taines conveyed to Alger Homes his land contract vendee's interest in a 76-acre parcel of land in Livonia. On September 17, 1958, Alger Homes sold an undivided one-half interest in the 76-acre parcel to defendant Jack Munson, as trustee for others. Neither of these transactions is now in dispute, but they illustrate the history of the land and something of the relationship between the parties.

Jack Munson's wholly-owned company, Shapiro-Munson, Inc., had frequently done plumbing work on

Alger Homes housing projects, and in 1959 it was working on an Alger Homes project on property in Warren, Michigan. During the year 1959, Alger Homes was unable to pay its bills as they matured. The company's only assets at the time were the remaining one-half interest in the Livonia parcel and the project in Warren, which was heavily mortgaged. By September of 1959, Alger Homes owed Shapiro-Munson $17,000 for plumbing work and Munson stopped work on the Warren project until he was paid. Taines could not raise the cash, and he could not proceed with other work on the project until the plumbing was completed. He begged Munson to continue the work so that the whole project would not be lost. Munson replied that he would return to work if he was given security for the $17,000 plus $8,000 "in front" for the work remaining to be done. Taines offered his house as security, but Munson would not accept that. He then offered the only other asset available, the one-half interest in the Livonia property. Munson agreed to accept that as security for the $25,000 plus $10,000 which he would loan to Alger Homes to pay other workmen on the Warren project, as requested by Taines.

Thus for the loan of $35,000, Munson was to get property worth at least $131,000,[1] as found by the trial judge, which was sold four years later for $182,500.

Having reached agreement between themselves, the two men went to Munson's attorney to formalize the transaction. Taines did not have his own counsel. The testimony is conflicting as to exactly what meetings occurred at this stage and who prepared which documents. However, it is clear that the

---

[1] There was, however, a balance of either $55,000 or $41,000 still owing on the underlying land contract for that half of the property, which Munson eventually paid.

attorney advised Munson that he would not have
security which would stand up against Alger Homes'
other creditors unless the transaction were made to
look like an absolute sale. Accordingly, on December 21, 1959, Taines signed an assignment of Alger
Homes' undivided one-half vendee's interest in the
76 acres as well as a quit-claim deed of it; an
option for repurchase running to Taines was prepared but retained by the attorney.

Immediately after the meeting in the attorney's
office, Taines and Munson drove to Munson's bank.
On the way, Taines told Munson that he would have
the money to repay him within 30 days and Munson
said he would give back all "the papers that [the
attorney] made out as an outright sale" as soon
as he got his money. At the bank, Munson delivered
his personal check for $35,000 and Taines immediately returned a check to Shapiro-Munson, Inc.
for $25,000.

In testifying as to his impression of the transaction, Jack Munson stated as follows:

"Well, after I bought the land and [the lawyer]
told me he had made out the papers like it was a
sale, I still didn't want that land. I wanted my
money."

And again he testified:

"Although this was a sale, I still didn't want the
land. In spite of that, it was a sale. We know it
was a sale; I was protected; this was it. As far
as [my lawyer], we had a sale. This is what
[he] drew up there. But I still didn't want that
land. I just wanted my money."

In accordance with instructions from Munson's
attorney, Taines had the transaction marked down
as a sale on the books of Alger Homes. Thereafter,
Alger Homes' financial situation got steadily worse,

the Warren project was conveyed to the mortgagee to avoid foreclosure, and the company became totally insolvent. Michael Taines paid some of Alger Homes' creditors from other funds (either those of his other corporations or of his brother Gerald, or both), and the company ceased to function in May, 1960. No further annual reports were filed.

Taines was not able to repay the money to Munson, nor did he make any further payments on the underlying land contract for the Livonia property. The next payment on that contract was due in April, 1960, and Munson urgently tried to get Taines to make that payment as well as repay the $35,000. Munson testified that he called Taines 40 or 50 times between January and April and went to his office four or five times. He insisted that he wanted his money, not the land. Taines replied that Munson had security and that was the best he could do. Munson finally made the April payment and all others until the land was paid off.

Munson testified that Taines told him not to worry because he, Munson, owned the land; Munson also testified that Taines told other persons that he no longer owned the land. But Munson continued to press Taines to pay the money and take back the land. During 1960, Taines lost all his money through an "unfortunate association" with a swindler. Around the end of the year he moved to Florida with his family. He had no further communication with Munson except when he forwarded a tax bill on the Livonia property which had come to him in March, 1962.

On September 2, 1960, Gerald Taines and the accountant for Alger Homes met Munson in his attorney's office. Munson there agreed to give Gerald an option until January 2, 1961, to buy the

land back for $87,000, but the option (which would have clearly been a fraud on Alger Homes' creditors) was never exercised. Munson claims that after January 2, 1961, he treated the land as his own. Gerald Taines, on the other hand, claims that Munson repeatedly assured him that the Taines interest in the land would be protected; that when Gerald sent a friend to bid on the land, Munson told him, "It's Gerry's land"; and that when Gerald called Munson after learning that the land had been sold in 1963, Munson told him, "I haven't collected the money yet. When I get mine, you'll get yours".

Munson received full and final payment for the Livonia property in 1965. He denied that anything was due to the Taineses. They began this suit in June, 1965.

There is no question in Michigan that a court of equity can declare a deed absolute on its face to be a mortgage, *Ferd L. Alpert Industries, Inc.* v. *Oakland Metal Stamping Co.* (1967), 379 Mich 251, *Emerson* v. *Atwater* (1859), 7 Mich 12, given clear and convincing proof, *Ellis* v. *Wayne Real Estate Company* (1959), 357 Mich 115. "In such cases the pecuniary embarrassment of the grantor, his indebtedness to the grantee, and inadequacy of consideration are circumstances the court looks to in determining the true character of the instrument. * * * And of the three, inadequacy of consideration is the most important." *Emerson* v. *Atwater* (1864), 12 Mich 314, 317. All of these factors are abundantly present in the instant case. Taines, and Alger Homes with him, was in financial trouble, and Munson had not only a debt against him but the leverage of his work stoppage on Alger Homes' only going project. Defendant tries to minimize the disparity between the value given and the worth of the land. However, even accepting defendant's

assertion that the property was worth only $131,000 (there are a number of higher expert estimates in the record) and that a balance of $55,000 remained on the underlying land contract, the fact remains that plaintiff had an equity of at least $76,000, for which Munson gave $35,000, or less than half the value.

Defendant argues that the conveyance was absolute because no obligation remained for Taines to repay the money and because Taines had an option to repurchase which was unilateral, citing *Swetland* v. *Swetland* (1855), 3 Mich 482, *Porritt* v. *Stone* (1954), 340 Mich 645, and other cases. Such contentions do not accord with the facts as presented by defendant himself. Defendant's behavior in asking plaintiff for repayment clearly evidences their understanding that repayment was due, as does Taines' statement on the way to the bank that he would have the money in 30 days. In addition, defendant is asking this Court, in the event an accounting is ordered, to award him interest at 10% on the $10,000 "loan" included in the $35,000 package. He cannot have it both ways. The obligation to repay would naturally not be stated in writing, since that would defeat defendant's purpose of making it *look* like a sale. As for the so-called "option", that document was never signed by Munson or delivered to Taines or recorded. It cannot control our characterization of the transaction in the face of abundant evidence in the record that the parties intended the transaction as a security interest, regardless of the form which Munson's attorney attempted to give it.

The trial court found that the transaction of December, 1959, amounted to an equitable mortgage. For the reasons set out above, we agree.

We cannot agree, however, with the trial court's further conclusion that the plaintiffs lost their equity of redemption through laches, waiver and abandonment. These three terms were used by the trial judge to describe his general conclusion that it would be inequitable to allow plaintiffs to take a share of the profits after they had earlier "sat back" and forced Munson to pay off the land contract and find a buyer for the property. But he does not support this conclusion with more specific findings of fact. Furthermore, the trial judge's statement that plaintiffs failed to assert any claim to the land between January 2, 1961, and the filing of the suit in 1965, is not borne out by the record. Gerald Taines testified that both before and after the sale in 1963, he asked Munson about the property and Munson assured him that he would settle with plaintiffs after he had recouped all his expenses. The trial judge made no finding that Gerald Taines was unworthy of belief as a witness, so there is at least a serious question in the record as to whether plaintiffs did continue to assert their rights.

Defendant makes much of the fact that plaintiffs "sat back" and kept quiet, forcing him to come up with the money to pay off the land contract, and to secure a buyer for the land. However, the total cash which Munson had to lay out to protect his security never approached the value of the land. *Cf. Brennan* v. *Finn* (1922), 217 Mich 584, where the Michigan Supreme Court stated that it was a point in defendant's favor that his outlays did approach the value of the property, but still found that the equitable mortgage had not been converted to an absolute deed. In addition, there is a suggestion in the record in this case that plaintiffs would have seriously prejudiced the interests of everyone involved if they *had* asserted more vigorously that they

had an interest in the property. One of the buyers in the 1963 sale testified that he would not have bought the land if he knew that plaintiffs had a claim against it. We mention this not to condone such secrecy—the best course would have been a foreclosure action by Munson—but to point out that defendant was not in fact seriously prejudiced by plaintiffs' actions.

" 'Laches is an affirmative defense', and 'mere lapse of time, without a showing of prejudice, will not constitute laches.' " *Kelley* v. *Hoogerhyde* (1946), 314 Mich 37, 42. " 'Laches will not be permitted to defeat recovery in equity if it would be inequitable to do so.' " *Plasger* v. *Leonard* (1946), 316 Mich 174, 181. Defendant has already recouped all of his expenses, and these will be amply allowed to him in the accounting which must follow. There is no reason to allow him to retain a windfall. Plaintiffs' actions do not justify a finding of laches against them.

Similarly, the record does not support the trial court's finding of waiver and abandonment. Defendant claims that the actions of plaintiffs subsequent to the original transaction amounted to a new agreement in parol converting the transaction from an equitable mortgage to an absolute sale. However, we find no such understanding proven between the parties. This case is far from the facts of *Sauer* v. *Fischer* (1929), 247 Mich 283, wherein the Supreme Court found that the claimant had destroyed his equity of redemption by encouraging a number of subsequent conveyances of the property without notice of his claim. A closer factual situation is found in *Brennan* v. *Finn, supra,* where the Supreme Court ruled that defendant had not proved that the deed had been changed from one for security to an absolute conveyance, even though he claimed to

have advanced further money to redeem the land from execution, on the understanding that it would then be his absolutely.

As plaintiffs point out in their reply brief, defendant does not cite any case where an equitable mortgagor lost his equity of redemption by mere inaction or nonpayment. Defendant has not met the burden of proving laches, waiver, or abandonment, and the trial court's finding that he had must be reversed.

We concur with the further finding of the trial court that the doctrine of estoppel is not applicable against plaintiffs because defendant has shown no prejudice. In paying the contract payments, taxes, etc., defendant did not act differently than if he was simply protecting his security interest in the property. Thus, whatever the actions and statements of plaintiffs were, defendant cannot show any detrimental reliance. He can be made whole in the accounting.

Defendant raises two further issues by way of cross-appeal which merit scant attention. First, he claims that the original transaction was intended as a fraud on the creditors of Alger Homes, and that consequently the courts should leave the parties where it finds them (*i.e.*, with a windfall in defendant's hands). However, the cases which defendant cites involve the situation where a debtor conceives the plan of transferring his property to a "friend" to hide it from his creditors. In such a case, it is perfectly true that the courts generally refuse to aid the debtor when his "friend" declines to reconvey as agreed. But that is not at all the situation of this case. Defendant was the one, as a pressing creditor, who insisted on a sham sale. (Plaintiffs ultimately paid Alger Homes' creditors from other funds of their own.) It is amazing now to hear

defendant say that because of his attempt to immunize himself from other Alger Homes creditors by a sham sale, he should be allowed to retain a windfall on the sale of the property. A court of equity can only be insulted by such mendacity.

An equally insubstantial issue is defendant's claim that Alger Homes is not properly in court as a defunct corporation in the process of winding up. MCLA § 450.75 (Stat Ann 1963 Rev § 21.75). It is undisputed that the corporation was completely inactive after the summer of 1960. Defendant, however, claims that the corporation is not winding up but is somehow operating illegally and should be barred from suit. He bases this claim solely on a statement by Michael Taines in the record that he hoped to reactivate Alger Homes to take advantage of its loss carry-forward for tax purposes. A statement of hope or intention by Michael Taines does not amount to activity by Alger Homes. The trial court correctly ruled that Alger Homes is properly in court.

Finally, the trial court made rulings as to how it would assess interest in the event an accounting should be ordered by this Court. Since we are ordering an accounting, we will review the trial court's proposed treatment of interest, which has been challenged by both parties. First of all, it was error for the trial court to rule that defendant should get 10% interest on the $10,000 cash loan portion of the $35,000 package. This ruling was based on a finding that Michael Taines' admission on the stand that he had orally agreed to pay 10% supplied the requirement of the usury statute, MCLA § 450.78 (Stat Ann 1963 Rev § 21.78) that a corporate agreement to pay more than the legal rate must be "in writing and not otherwise". This last-quoted language is the crucial part of the statute; it is

forceful and unambiguous. The statute itself is in derogation of the common law and must be strictly construed. We cannot believe that the legislature intended to include within the meaning of a writing the later admissions of one officer of the corporation as to his own prior oral commitments. Defendant is therefore entitled only to the legal rate of interest, if any at all.

The trial court did not err in holding that plaintiffs were entitled to interest from the filing of their complaint on June 23, 1965. PA 1965, No 240, amending CLS 1961, § 600.6013 (Stat Ann 1962 Rev § 27A.6013), became effective on July 21, 1966 and was held " 'to operate retrospectively and apply to all actions accrued, pending or future' ". *Ballog* v. *Knight Newspapers, Inc.* (1969), 381 Mich 527. The judgment in the instant case was entered February 9, 1968; therefore PA 1965, No 240, entitles plaintiffs to interest from the filing of their complaint.

However, in an accounting, a court of equity may, in its discretion based on the equities presented, "allow or withhold interest as, under the circumstances of the case, seems equitable and just, except in cases where interest is recoverable as a matter of right". *Cyranoski* v. *Keenan* (1961), 363 Mich 288, 295. We are confident that the trial court will exercise this discretion carefully.

Reversed and remanded for an accounting. Costs to plaintiffs.

All concurred.